Case number 15-1465 et al. Sierra Club et al. Petitioners, Environmental Protection Agency and Andrew Wheeler, Administrator, U.S. Environmental Protection Agency. Mr. Johnson for the petitioners, Mr. Rosen for the respondents. Good morning. Good morning, Seth Johnson for petitioners. I reserve three minutes for rebuttal. Congress amended the Clean Air Act in 1990 to create a comprehensive program for driving attainment of ozone standards. That program relies on curbing EPA's discretion and holding regulators and polluters accountable to ensure communities get real, effective pollution reductions. As it has many times before in the rules at issue here, EPA has once again sought to inject discretion in the form of what it calls flexibilities. I plan to focus on three issues. First, how EPA's inter-precursor trading program illegally allows increased emissions of non-ozone-forming pollutant to be offset by lesser reductions in emissions of a different ozone-forming pollutant. Second, how EPA unlawfully allows contingency measures to be already implemented measures that failed to prevent the contingency from happening. And third, how EPA's implementation-based approach to milestone compliance demonstrations unlawfully and arbitrarily removes the requirement that states verify that mandated emission reductions occurred. I'll begin with inter-precursor trading. In non-attainment areas, new source review program requires that new emissions of an ozone-forming pollutant from facilities like refineries must be offset by greater reductions of emissions of such ozone-forming pollutant. But under EPA's inter-precursor trading scheme, the reduced emissions can be of a different ozone-forming pollutant and can be less than the increased emissions. EPA's scheme violates the total emission reductions of volatile organic compounds to total increased emissions of such air pollutant. Such air pollutant has to refer back to the only air pollutant that's mentioned, volatile organic compounds. But EPA would allow it to mean oxides of nitrogen. EPA is thus unlawfully writing such out of the act. Oxides of nitrogen are a distinct chemical that Congress separately extended 7511AA4 to cover. Inter-precursor trading abrogates other plain text too. 7503C1 is explicit that increased emissions of a pollutant must be offset by an equal or greater reduction in the actual emissions of such air pollutant. But under inter-precursor trading, increased emissions can undisputedly be offset by a lesser reduction in emissions. That's at 7511AA531. And that outcome plainly contravenes the act. EPA's statutory interpretation does further damage to the act. 7511AA4 and 7503C1 speak exclusively about emissions and require offsetting emission reductions. They don't refer anywhere to ambient pollution levels, but EPA's attempt to rationalize inter-precursor trading relies on redefining the offsetting that emission or emissions from the acts offsets provision. And that's evident throughout EPA's brief. But Congress knew the difference between ambient levels of air pollutants and emissions of air pollutants. In 7511AC2C and 7511AC1, Congress expressly referred to emissions and to ambient concentrations. But it referred only to emissions in 7511AA4 and 7503C1. And that distinction must be given effect. I'll move now to contingency measures. Mr. Johnson, if we were to agree with you about the statutory issue, am I right that we don't have to reach your arguments about banked emissions and backsliding provisions? Yes, Your Honor, that's correct. Okay. So on contingency measures, I understand your textual argument, but help me understand what sense it would make in the context of a pollution reducing statute for Congress to create an affirmative incentive for companies or states not to use available measures because they need to hold them in reserve to count as the contingency measure. Sure. There's two answers to this. One is a legal answer. And the other is there's an issue with the premise of the question, which is that they are holding measures back. But on the legal point, Congress in 1990, it amended the Clean Air Act because it recognized that sort of full board discretion to the states and to regulators didn't work. And there needed to be accountability measures. So Congress gave two commands in the act. One command is for areas to come into attainment and to implement reasonably available control measures as expeditiously as plans might not work as well as expected, other things might change. It also recognized there need to be backup measures. And so it also commanded that there be contingency measures. And that's what contingency measures are for. They're for when the existing measures that areas have been rushing to put into effect. They're for when those measures fail. But EPA is allowing contingency measures to do nothing at all, nothing new, they add nothing. And so it's writing the contingency measures entirely out of the act. And that's not a rational, that's not a permissible statutory interpretation. And then as for the premise of the question, a lot of times the mission reductions that states rely on for contingency measures are nothing more than surplus reductions that have already occurred. So for example, we pointed to this at JA 605 to 606, Connecticut for its reasonable further progress contingency measures. It said, well, we're going to be getting a lot of emission reductions from turnover of non-road engines, like new engines are cleaner than old engines as they replace them, emissions go down. And over the six years of the progress requirement, we're going to be getting more emissions than we need. So the surplus emissions from that period, that's our contingency measure. And there's nothing that's being de-incentivized there, that's something that's already happening. We think it's good that it's happening, but it's just shifting numbers on a page and that's not consistent with Congress's intent in 1990. And I'd also note that if states want to implement contingency measures before they're implemented, as long as they come up with new measures that are actually contingency measures. And it may be hard to come up with these measures and these measures may be tough, but that's what the act requires. The threat of tough measures creates a powerful incentive to reduce pollution now, as this court held in South Coast 1 and reiterated in South Coast 2 when it referred to contingency measures as penalty. Contingency measures that are already implemented provide no incentive to make additional reductions now, and that violates the act. Um, if there are no further questions on contingency measures, I've moved to the milestone compliance demonstration. Let me, let me ask you a question and I'll make sure you understand your argument on the baseline emissions question. If I'm recalling correctly, you suggesting that when EPA allows one of two possibilities, this ensures that one of the possibilities will be a significantly less favorable result in terms of statutory goals. And so you're allowing for gamesmanship that is because one is going to be where I, if I remember correctly, something in your brief, you compared to 17, uh, 2017, 2018. Am I recalling correctly? Uh, the numbers would be significantly different depending upon which alternative you selected and in adopting that approach, this would ensure that, uh, the, uh, regulated party could go for a less favorable, uh, position. Is that right? The problem is it opens the door to regulated parties going for a less favorable position. It opens the door to regulated parties saying, this is the one that we'd rather do. Uh, we don't have to do as much. And, um, you know, so we're going to choose that. That's, that's sort of the real world concern. The legal problem is just that that sort of flexibility isn't allowed. And EPA hasn't given any statutory justification for allowing it under the act. Well, they're offering a statutory rationale by using 1990 and they're saying 1990 included, uh, the two possibilities. I'll, I asked them about that coincidentally, maybe, but nonetheless, they're referencing the statute. And I'm trying to understand is the thrust of your argument that, uh, nonetheless, the position they've taken is arbitrary and capricious because it doesn't make sense to allow parties to pick one of two. When you know, one is always going to be inconsistent with the statute's goals. Our argument is primarily a statutory argument. Yeah. And I'm not, I'm not understanding that where, where is, I understand your other statutory arguments. Where is the statutory argument that requires, and which way are you going? Cause your position has not been always consistent. Which way are you going in terms of the two alternatives that EPA recites? Are you picking one of them? Are you saying there simply has to be one only? What do you say? Okay. The only challenge we raise here is to EPA's decision to allow areas to choose baseline year between the two options. We're not challenging the specifics of either option. We're challenging that there is an option. It seems to me that's an arbitrary and capricious argument. Well, the court has held that the statute is ambiguous about what the baseline year is. That's a different question from who gets to choose the baseline year. That's a different question from whether states get to select their own baseline year. And as the court's aware under Chevron, you have to look at the precise question and EPA is looking at the wrong question. The, and I point to, for example, in NRDC 749 F 3rd, 1055, 1063, this court rejected an EPA regulation that the agency claimed was just fleshing out the term appropriate, which is a was a, sorry, a quintessentially discretion granting ambiguous provision. But it rejected EPA's regulation because courts authorized, sorry, the act authorized courts, not EPA, to make that determination. So the statutory argument here is EPA is looking at the wrong question. It's looking at whether the act is ambiguous about what the stat, what the baseline year is. But that's a distinct question from whether states can select their own baseline year. And it still hasn't analyzed that question anywhere. Mr. Shelton, I thought, I thought your, well, go ahead Larry. I didn't mean to interrupt you. Go ahead. I thought your argument was number one, that in the statute, Congress picked one baseline year, 1990, and that the reasons EPA has given for having two, namely flexibility, is not grounded in the statute. Isn't that your argument? Yes. Well, and in fact is inconsistent with the statute, right? Because the statute was designed to eliminate this kind of flexibility. Right. I think, you know, our argument is EPA hasn't provided a statutory basis for allowing the flexibility for the reasons, and that it's inconsistent. Yeah. Yeah. And there's no basis in the statute at all for allowing this flexibility because Congress. There's, there's, there's no basis in the statute for any of this. Anything. Yeah. I mean, that's the problem. And this, with this issue, that's the problem. The statute says 1990. So the reality is we're just, we're just picking stuff up. And if it is a reasonable extrapolation to say you can use attainment date, and it's a reasonable extrapolation to say you can use the triennial emission date. Why isn't it a reasonable extrapolation to say that people can pick either of those two reasonable baselines? There are three reasons. And I think judge Tatel has identified at least two of them. The three reasons are one Congress didn't pick multiple dates. Congress specified in other circumstances when a ground rule of implementation like this could vary. It specified that in 7511 AI and 7511 DB2. And it didn't specify that for here. And the third reason is overall when Congress amended the Clean Air Act in 1990, it did so in order to curb flexibility. And so as this court held in South coast one, it's irrational to resolve an ambiguity in the act in a way to maximize flexibility. That's just contrary to Congress's clear intent, even under Chevron step two. So I disagree that there are no guideposts. To give states an option where just, just assume that either one, either option would be reasonable if imposed by itself. I'm sorry, I missed the, I was still talking when you started your question. I mean, I get the point about this is a discretion reducing statute, but that seems to me not to have a lot of resonance where all we're talking about is a reasonable options, either designation, the attainment date, or the triennial emission date. We've, we've said either one of those is reasonable. Right. Either one of those is reasonable. What's not reasonable is allowing states to choose because that's maximizing the flexibility and under South coast one, that's not a rational way for EPA to resolve an ambiguity under this statute. To permit flexibility within a range of reasonable options is foreclosed by the statute. It can't be EPA's fundamental basis for it. Okay. For allowing it. I'm sorry. Yeah. Just to go back to the first question that I take at your point is that by allowing a choice, the states could pick the least rigorous choice, correct? That is that right? That's correct. Yes, your honor. Now go back to his question. Is there evidence in the record that say you have two choices, choice A and choice B, is there evidence in the record that for a certain number of states, choice A would be more rigorous and for another set of choice B would be more rigorous? I'm not aware of that evidence in the record, your honor. Yeah. I mean, that's the other problem that's perplexing. When I think about it, it's hard to know what the choice is produced. And is that, does that depend upon the state? So it's true. A state can pick the less rigorous choice, but what does that really tell us about the entire universe? I mean, the difficulty with your argument is if you concede that both choices are reasonable, that's a bad starting point for your argument because both are reasonable. And we have said that there is Chevron two type ambiguity in this provision. And both of these choices are reasonable. It's hard to say that the agency says, well, you can pick either of these reasonable choices. It's hard to say that that breaches Chevron two. I mean, if they're both reasonable and I'm not, I did look at your argument that you have flexibility to pick the less favorable, but I don't know what that means nationally. I don't understand that. So I'm back to your concession that either choice is reasonable. We, we agree with that. Well, if either choice is reasonable, what, what's the Chevron two violation. And we've already said, it's a Chevron two case. We've said that in the prior case, there's an ambiguity to be filled here. And I don't know what your option is. Which way do you land? Are you saying they can only allow one? We don't care which they pick, or are you saying there's a certain one that they must compel as the date? We're saying that they can pick either. EPA can pick either one, but EPA has to pick. It can't leave it up to States to pick. Those are distinct questions under Chevron. Distinct questions are who picks them. Okay. Go ahead, David. That only works if there are negative, if there are environmental consequences to the choice. That's why, that's exactly why I asked my question. And, and in response to judge Edwards first question, I thought you said, yes, you were arguing that there were environmental consequences to the choice and that States could pick the one that was easiest for them. But when I asked you the question, I thought you said there isn't any evidence in the record that it could vary from state to state. Because if it can't vary from state to state, then I guess I don't, or does that make a difference? I mean, is it that, is it that, is it that EPA gives them options A and B and A is the easiest to meet and they all pick A. Is that your point? I think, I, I apologize if it seemed like I gave different answers. I've interpreted your question as, was there evidence in the record, spell, you know, spelling out whether, you know, one year versus another year is generally going to be better or worse. And I'm not aware of that evidence. But the, the point still stands that there's going to be a difference between those years and States can now choose between the years in order to gain their progress requirements. But how do we know, see, you use the word de-game it. I understand that. I understand that argument theoretically, but is there in the record that gamesmanship would work here? Yeah. I mean, that's what you're not advancing. And it really, I'm not going to pressure you anymore in this one. I just want you to understand at least what my concern is. It's a very hard argument to me to digest, to have councils say options A and B are perfectly reasonable, but it is unreasonable for the agency to say a regulated board can pick A or B. And I get that, that doesn't make sense to me. That makes no sense whatsoever. So just want you to understand what I struggled with as I looked at it. And I was wondering whether you were trying to suggest it could be gaming and I couldn't figure out how that might concern. But I want you to understand what my concern is because I don't know how you can start with your premise because it doesn't work. Okay. Well, I appreciate that. And I see I'm over time if there are no questions. I think we'll move on and hear from the agency and I'll give you a couple of minutes for rebuttal. Okay. Thank you. So yeah. Thank you, Your Honor. Perry Rosen for EPA. I'd like to start out with inter-precursor training since we haven't spoken about that yet. Inter-precursor training reduces the level of the pollutant, the ozone. It's been allowed for years with regard to other pollutants that are based on precursors like particulate matter. And it's been allowed for decades with regard to it. There is no linear approach to reducing ozone through the reduction of precursors. The amicus for the petitioners, for instance, the Pasadena group, I doubt if in their area, they say, quote, most people live in areas where ozone levels increase when NOx, when nitrogen oxides decrease. In contrast, amicus on our behalf, the South Coast group in Southern California, say that reduction of NOx is much more effective than VOC reduction in ozone. So we're given a non-attainment area to balance the reductions to actually accomplish what the statute wants them to accomplish. Petitioners arguing that the statute doesn't permit that. It says, one of these provisions says the ratio of total emission reductions of VOCs to total increased emissions of such airport. And that is the ratio provision, which applies for each level of non-attainment. And that sets the ratio. But it refers to the, it does not itself call for a reduction. It says when an offset is required somewhere in the park, petitioners concede that the offset provision is 7503. And that provision only calls for the reduction of the air pollutant. There are other provisions as EPA set out in its regulation that just apply to VOCs and don't refer to the air. And in those cases, EPA has expressly said inter-precursor training is not permitted. So your position is that the phrase, such air pollutant in AA4 refers not to the VOCs one phrase before, but to ozone that appears 10 sections earlier in a very complex statute where 10 sections is probably 20 pages of text. That is our position, but recall that this statute was written in two parts. Subpart one was written at one time and subpart two was written in a second. So in subpart two, Congress made more specific requirements to give specific numbers, to give specific levels, to give specific ratios. But in this case, it referred back to the offset requirement, which is 7503, which is titled offsets. That's the requirement that says when a new facility comes in, it needs to offset its emissions of the air pollutant. And that's what inter-precursor training does. And it must do it by definition because the regulation says it is only permitted if it offsets at least the same or greater amount as a linear reduction would do. There are provisions. The definition of air pollutant allows EPA to define precursors like VOCs or NOx as itself an air pollutant. That's in the definition of air pollutant. It includes, quote, any precursors to the formation of any air pollutant to the extent the administrator has identified such precursor or precursors for the particular purpose for which the term air pollutant is used. But that didn't happen here. EPA did quite the opposite. EPA explained that, in fact, in this case, in the case of offsets, the precursors, VOCs and NOx, are not to be deemed air pollutants. The provision that the petitioners rely on sets the ratio. The ratio is still complied with. It's just complied with in a manner that achieves the purpose. It's complied with by disregarding the plain language of the such provision. You have to ignore that word to be able to get where you want to get, or referring back to ozone earlier in the statute. It's the only way you can get there. Because even that provision uses the term air pollutant, and that is how EPA interprets it, interprets it since that provision. But it says such air pollutant, and such refers back to NOx. That's the way it ends. Did you diagram sentence in school? If you diagram this sentence, that's what that refers to. Well, again, we believe it. Congress wrote the subpart two in a convenient way. It wrote its provisions just with VOCs, and then it included one provision that just said everything we just basically also applies to NOx, the nitrogen oxide. That structure cuts against you. That shows Congress, for these purposes, separately focused on oxides of nitrogen and VOCs. Right. But Petitioner's argument is they all apply to NOx as well. If you look at the specific provisions, for instance, the very provision they rely upon, which calls for the application of the exact same ratio, let's say for marginal, the 1.1 to 1, also applies to NOx. But that very provision says that the administrator doesn't have to apply it. The administrator can determine that, in fact, air quality will not be increased by applying that ratio. It allows the administrator to say, in fact, in a certain situation, we're not going to apply the ratios at all because of the fact that it results in better air quality. Congress further recognized that interprecursor training can be beneficial and should be used. It did it in the section on reasonable further progress. It expressly said, called for interprecursor training. Doesn't that demonstrate that if Congress knows how to do it in one provision, the fact that they didn't do it here suggests that the Petitioner's are correct? No. I know that is a basic rule, but it's a basic rule that this court has said in many situations doesn't apply. Why doesn't it apply here? Just explain to me why it doesn't apply. It doesn't apply here because in this case, reasonable further progress. I'm sorry, Judge, you're breaking up. Go ahead. Okay. In this case, in the reasonable further progress provisions, it talks only about VOCs, VOC reduction. It doesn't talk about air pollutant. As EPA explained, in that situation, where you're not dealing with the air pollutant that's an issue, ozone, and Congress spoke only and exclusively to VOCs, then it needs an extra provision. Congress needed to include an extra provision to allow it, which it did with regard to reasonable further progress. With regard to offsets, where the offset is of the pollutant- Yeah, I had the argument. Let me take this, Mr. Rosen, because I'm sure you want to spend some time on the other provisions. If we were to agree with the Petitioner's on this, do we vacate the entire interprecursor training program, or is this provision severable? How would that work? I would say that it's severable. Interprecursor training, as I said- The Petitioner said- What's that? Right. The Petitioner said it's severable. Do you agree? Yes, I would say it is severable. Yes. Milestones, we talked about the baseline, and I don't think, unless there's any questions, need to go there. The second part of their argument is that somehow it has to be measured, when you measure the demonstration of reaching reasonable further progress, has to be measured with actual emissions. The statute says expressly the opposite. Well, the statute says that the baseline needs to be defined by actual emissions. When measuring the compliance, when looking at the demonstration of whether the area has reached reasonable further progress against that milestone, 42 USC 7511AG2 says that the demonstration of compliance with reasonable further progress milestones shall be submitted in such form and manner and shall contain such information analysis as the administrator shall be requiring. Can I take you back to the baseline emissions- Yes. Section? A lot of the briefs talk about B1B, which is the provision that says baseline emissions mean the emissions, but immediately after that provision is a different one, which is mentioned only in the reply brief and only very quickly, but seems like it could be a pretty important provision here. It says, this is B1C, says that emissions are creditable to the reductions only to the extent they, and this is the precise framing, have actually occurred. Though doesn't that pretty- Which section are you pointing to, Greg? 7511AE1C. AE1C? B, B as in boy. Okay. It's titled general rule for creditability of reductions. Yes. Your Honor, that was only raised in the reply brief. You were right about that. Although we forget the statute interpreted properly, Mr. Rizzo. Yes, we agree with that. In EPA's view, the word actually there refers to the time period, that the reductions need to have occurred within that six-year time period. That's what actually it's referring to, not to actual triennial emissions inventories. That has to be looked at in the way Congress specifically defined how the measurement against the milestones should be addressed. It's specifically left that to the broad discretion of the EPA administrator. There's good reason- I missed what you said there. Why doesn't actually occurred compel a backward-looking measurement at the end of the period, rather than simply a forward-looking projection from the beginning of the period? Well, for the same reasons, it doesn't look at a forward-looking projection. It looks at measuring whether when you hit that milestone, the emissions reductions have occurred. Just as in other cases outside this particular six-year provision, for instance, the annual inventories that have to be complied with, EPA determined that that is very difficult to do. The data is most often not available or not necessarily reliable because it depends on triennial emissions inventories that may be stale by the time you make that determination. Since it's a three-year inventory, averaged over three years, it may be two years old. It may not show, it may not reflect advances you've made in the last two years. Again, our view is that the word actual there refers to them being heard within the six years, but that does not change the other provision, which gives full discretion to EPA to make the determination of how you make the measurement. Okay, but the petitioners rely on... They acknowledge the general authority of the administrator, but they argue that there's two provisions that limit that general authority, that discretion. One is the one Judge Katz has just mentioned. The other is... The statute itself defines the baseline emissions from which milestone compliance is to be measured in terms of actual emissions. The point petitioners make is that how can a state show there's been a reduction in actual emissions without presenting any actual emission data? That's their point. And when you combine that with the provision Judge Katz has just pointed out, you've got two specific provisions of the statute. This is their argument, two specific provisions that limit the administrator's discretion. So what's your response to them? Again, because if you're looking at the baseline provision, for instance, and I understand it's also in this second provision, but basing it on actual emissions makes sense with regard to a baseline, because those are historic, and those can be looked at, and you have the time to do that. Under the statute, not EPA's regulations, but under the statute, a milestone determination must be made within 90 days of the milestone, and those actual emissions data are just either not available at all or oftentimes not reliable because of the timing. Well, maybe the administrator should be going back to Congress and saying, you've imposed a standard on us we can't meet, but from where we're looking at this, the court, this is what the statute says. But again, the statute, for instance, the statute would only, in that case... Sorry, that provision would only apply to the initial six-year determination, which many jurisdictions don't have to make. It would not apply to the annual... You're pretty much... Mr. Rosen, is there any other provision you want to mention quickly? Yeah, just on the contingency issue, that's pretty much set out in the two court decisions, the two sides. The only question is whether that's ambiguous, but the interpretation put forth by the petitioners just would make no sense under petitioners' view and under the majority in two jurisdictions, and one jurisdiction wanted to put... Wait a minute, hold on. Yeah, you're not really serious, are you, that we should count judges and see if... No, no, no, we were just... Well, that's what you argue in your brief, that we should say that you're saying that, look, some other judges split on whether it's ambiguous, and therefore it's ambiguous. I think all we were trying to show is that reasonable... Reasonable minds can differ. This is up to you. This is your court. Yeah, but the fact that judges disagree about it is not evidence of that, and I think there's many cases where we have ruled the statute is clear when another circuit has unanimously said that it's ambiguous. In fact, petitioners cite one in their reply brief. But here's the point they make. They say, to make this very simple, they say measures that are already implemented are not measures, quote, to be undertaken. Can't be. If they're not measures to be undertaken, if it fails to meet the milestones, they're just measures that failed to make reasonable progress. That's their argument. It's a statutory argument. But they can be. For instance, let me give you an example or two. An area or a state may have a vehicle inspection program that they've just started that is a contingency measure, but they've decided to go ahead and start it, and they're on a pilot program, and it's reducing emissions, and it shows that, in fact, this is a good thing, and it's going to continue to reduce emissions at even higher and higher levels as they go on. That contingency, that jurisdiction should not be punished for starting that contingency measure before they reach the time when the contingency measures kick in. Mr. Rosen, what's your answer to their question? They're arguing about the language of the statute. I understand your policy argument here, but they're saying the statute's clear. What's your answer to that? Already implemented measures can't be, quote, measures to be undertaken. They're already implemented, and they failed. Only if you, again, see them in isolation. As another example, if an area wants to transform all of its cars, its vehicles, its government vehicles, to electric vehicles, it can start that process, and as it goes on, the emissions continue to be reduced. The application of that measure to a greater number of vehicles is taking effect as you go forward. You said they would be punished if we went to petitioners' view. How so? They would still take these actions, and that has nothing to do with whether they otherwise are required to have contingency measures. I think according to petitioners, they'd have to come up with a new contingency measure because that contingency measure has already been put in place. That's their argument. That measure, well, no, no. That's what conceptually I'm trying to understand. That measures that they've put in place are measures that count for them now, right? They don't count towards any standard in order to use them now and still preserve them as a contingency measure. Well, forget the contingency measure. Just help me. They count now, right? Forget any requirement of contingency. They count, right? If you mean whatever emissions reductions are occurring, they count. They count. So they're not being punished. They get the credits that they're due for those measures, right? Okay. So now the question is, why should they be able to claim that measures that they would properly put in place and that are working and that they're getting credit for should also count for contingencies that have to be undertaken in the event that these measures and others aren't working as they should? That's the part that's perplexing. They're not being punished. That's what caught my attention. You're saying they're being punished. They're not being punished because they're getting full credit for these measures that are in place. So the only question is, has Congress said, yeah, that's fine. You get all the credit in the world for that. And we're not doubting it. And we're glad you're doing it. But in the event there's a problem, you have to have something else that you will undertake to cure the problems. Now, why is that wrong? Well, maybe I can explain it. Your examples aren't responding to the concern is what I'm trying to say. Okay. Let me try again. Let's take this same example of exhaust, looking at the exhaust, measuring the exhaust from vehicles or going to electric vehicles. If a jurisdiction is that, and it's not required for any of the requirements, that's a prerequisite. If they are faced with the issue of should we do that now and help add to the reduction of emissions, or should we hold it and not reduce ozone emissions more than we are obligated to do, just in case we need to, then that's what they'll do. And the air will be worse for it. Why wouldn't they do it now to get both to reduce pollution and they'll get credit for it now? Not if this is not considered a contingency measure. No, no, no. Don't they get credit for it just in reducing emissions? No. As I understand petitioner's argument, they would have to put in a new contingency measure. Yeah. Well, maybe we're talking past each other. I just asked you if a jurisdiction implements a new program that has the effect of reducing emissions. They're getting credit for that the moment they do it, right? Forget the contingency. They're getting credit for it. It works to their advantage to reduce emissions. There are ongoing credits that are being developed, right? Yes. That's right. So that's what I'm not understanding your punishment argument. And why wouldn't they go ahead and do it if they're going to be credited for it? You're not going to let them count as a contingency. That isn't ringing true. Why wouldn't they go ahead and do it? Both because it helps the environment and two, because they're going to get credit for it. Yeah. They will get credit for it in the measurements, but they will not get credit for it in the exercise of the required contingency. Of course. I understand. Yeah. That makes perfectly good sense. I would have been concerned if you had told me, no, they're not going to get any credit for this. And so they won't do it. You conclude they won't do it if we won't allow it as a contingency. That makes no sense to me. Of course, they'll do it if they'll get credit for it and it helps the environment. Why wouldn't I do it? That's the part. I'm not, I'm just not getting that argument. All right. I don't have any more judge Tatel. Okay. Thank you. Thank you. Counselor. Great. I'm fine. Judge Tatel. Let's see, Mr. Johnson, I think you were over time too, but we'll give you two minutes. Thank you, your honor. EPA's argument confirms that it's making policy arguments. Our arguments are statutory. EPA has no authority to depart from what Congress specified only in the Clean Air Act. Just to touch on its inter-precursor trading argument, EPA's argument overrides plain text of the statute. Its excuse for overriding the plain text of 7511AA4 is that putatively 7503C1 was written earlier. That makes no sense both as a textual matter and as a factual matter. It's wrong. 7503C1 was added to the statute at the same time as 7511A. Also EPA's post hoc claim that EPA didn't identify volatile organic compounds and oxides of nitrogen as precursors. That's false. Congress identified them as pollutants in the statute and EPA in fact made the identification that 7602G actually calls for both in this record at JA183 and in its regulations in 40 CFR 51165. On the milestone compliance demonstrations, the point of the milestone compliance demonstrations is to look back and check whether the reductions that were hoped for have actually happened. Judge Katz, as you pointed to the provision we raised on reply, Judge Tatel, as you point out, there's loads of case law that says this court shouldn't ignore the statute as it's actually written. EPA would be ignoring the statute as it's actually written and overriding the demand for verification. On contingency measures, there's no ambiguity here. There's no punishment in having to follow the statute. EPA is trying to make this all an accounting game. Can I just very quickly say one more thing about the baseline year? You asked me about the record. I interpreted that as the administrative record. We discussed in our this is a declaration page nine. We discussed how the baseline year option opens the door to the sort of gaming that we're concerned about. If there are no questions. Thank you. Thank you gentlemen. We will take the case under submission. Thank you.
judges: Tatel, Katsas, Edwards